UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VANESSA LAGUERRE,
Plaintiff,

-v-

PARAMOUNT GLOBAL, *et al.*,
Defendants.

25-CV-879 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiff Vanessa Laguerre brings this action against Paramount Global ("Paramount") and Douglas Johnson (collectively, "Defendants"), asserting claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*; the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*; the New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law § 290, *et seq.*; the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101, *et seq.*; and the New York Labor Law ("NYLL"), N.Y. Lab. L. §§ 195, 198, 215, 650. (*See generally* ECF No. 1.) Before the Court are Defendants' motion for discovery sanctions (ECF No. 35) and Defendants' motion for summary judgment (ECF No. 40). For the reasons that follow, Defendants' motion for discovery sanctions is granted as modified, and Defendants' motion for summary judgment is denied as to all claims, except Laguerre's claim under NYLL § 195.

# I. Background

## A. Factual Background

The following facts are taken from the parties' Rule 56.1 Statements. (ECF No. 42 ("Defs.' Statement); ECF No. 53 ("Pl.'s Resp."); ECF No. 54 ("Pl.'s Statement")). The facts are

undisputed except where otherwise noted,[1] and they are construed in the light most favorable to Laguerre as the non-movant. *Friend v. Gasparino*, 61 F.4th 77, 84 (2d Cir. 2023) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

Paramount is an American media and entertainment conglomerate. (Defs.' Statement ¶ 1.) From July 2019 to November 2024,[2] Laguerre served as the Executive Assistant to Johnson, the Senior Vice President of the Short Form Production, Multi-Platform Group at Paramount Skydance. (*Id.* ¶¶ 2, 4-5, 85.) Laguerre's primary responsibilities as Johnson's assistant included managing his calendar and arranging his travel. (*Id.* ¶ 7.) Laguerre was initially hired as a temporary, project-based employee through a third-party payroll service, before Johnson elevated her to a regular staff employee in September 2021. (*Id.* ¶¶ 4, 12.)

**1. Laguerre's Overtime Hours**

As a temporary and regular staff employee, Laguerre was scheduled to work from 10:00am to 6:00pm. (*Id.* ¶¶ 11, 20.) The documents governing Laguerre's temporary employment expressly stated that she was eligible for overtime, and Laguerre submitted weekly timecards with overtime hours to the third-party payroll service while she was a temporary

---

[1] Defendants did not file a response denying factual allegations made in Plaintiff's Statement. Nevertheless, the Court will consider allegations in Plaintiff's Statement to be undisputed only when those allegations are not contradicted by allegations made in Defendants' Statement. The Court deems this approach sensible given the discretion vested in district courts by Local Rule 56.1, *see T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) ("[F]ailure to respond to a Rule 56.1 statement *permits* the court to conclude that the facts asserted in the statement are uncontested and admissible." (emphasis added)), and Local Rule 56.1's focus on requiring the *non-moving* party to respond to the facts asserted by the party moving for summary judgment, *see* Local Civ. R. 56.1(c) ("Each numbered paragraph in the statement of material facts … by the *moving party* will be deemed to be admitted … unless specifically denied and controverted … by the *opposing party*." (emphases added)).

[2] Johnson notified Laguerre of her termination in August 2024, but Laguerre remained on Paramount's payroll until November 15, 2024, due to Paramount's obligations under New York law. (Defs.' Statement ¶¶ 84-85.)

employee. (*Id.* ¶¶ 9, 10.) After Laguerre became a regular staff employee, she received wage notices that reflected a regular hourly rate and an overtime rate. (*Id.* ¶¶ 14-15.)

The parties dispute whether, in practice, Paramount and Johnson discouraged Laguerre from submitting overtime hours. Defendants contend that Johnson expected Laguerre to submit overtime hours above her forty-hour workweek (*id.* ¶ 21), and Johnson testified in his deposition that he never instructed Laguerre or his prior assistant, Sasha Fugazy, not to submit overtime hours (ECF No. 43-2 at 102-03).[3] Defendants further cite two instances in which Johnson instructed Laguerre to submit any overtime hours that she worked. (Defs.' Statement ¶ 22; *see also* ECF Nos. 43-9 at 5, 43-12.)

While Laguerre admits that Johnson instructed Laguerre to submit overtime hours on two instances (Pl.'s Response ¶ 22), Laguerre denies that Johnson expected or encouraged her to submit overtime hours (*id.* ¶ 21). In support of that denial, Laguerre cites her own deposition testimony that she was trained by several other employees in Johnson's department not to enter any overtime (ECF No. 56-3 at 61-64), Fugazy's deposition testimony that Johnson told her not to input overtime hours for small or menial tasks (ECF No. 56-4 at 30-34), and Johnson's deposition testimony that he would approve Laguerre's timecards even though they were "probably . . . not accurate enough" and even if he "knew that she had worked more than ten to six or less than ten to six" (ECF No. 56-1 at 90-91). Laguerre contends that, because of her training and general understanding of Johnson's expectations, she did not submit overtime hours unless the additional work required the entire team to engage in overtime work. (Pl.'s Statement

[3] Page numbers in this citation and in similar citations to deposition transcripts refer to the internal pagination. All other page numbers in citations to the record refer to the PDF pagination.

¶ 11). Accordingly, Laguerre alleges that there were several instances in which she was not paid overtime hours that she completed. (*Id.* ¶¶ 19-33.)

### 2. Laguerre's Wage Notices

It is undisputed that Laguerre received some wage notices throughout her employment that reflected an hourly rate and an overtime rate. (Defs.' Statement ¶¶ 14-15.) However, the parties dispute whether those wage notices correctly reflected Laguerre's rates, as well as whether Plaintiff received every necessary wage notice.

Defendants allege that Laguerre "did not identify a single instance in which she failed to receive a required wage notice." (*Id.* ¶ 16.) Laguerre denies this allegation, citing her testimony that Defendants failed to provide the wage notice to which she was entitled at the time she was fired. (Pl.'s Response ¶ 16; *see also* ECF No. 56-3 at 450-51.) Laguerre further alleges that her wage notices reflected incorrect wage rates. (Pl.'s Response ¶ 15; *see also* ECF No. 43-7 (noticing a wage rate of $23.25); ECF No. 56-6 (indicating in payroll a wage rate of $34.28).)

### 3. Laguerre's Parental History, Maternal Leave, and Termination

When Laguerre started working for Johnson at Paramount in July 2019, she already had one young child (Defs.' Statement ¶ 6), but she did not inform Johnson or anyone at Paramount of her child (Pl.'s Response ¶ 6). Within Laguerre's first few months of working at Paramount, Johnson asked Laguerre whether she was "going to start a family any time soon." (Defs.' Statement ¶ 53.) On July 30, 2021, Laguerre gave birth to her second child. (*Id.* ¶ 55.) Laguerre did not disclose her second pregnancy to Johnson until January 2022, and she did not request any maternity leave related to her second pregnancy. (*Id.* ¶¶ 56-57.)

Laguerre then became pregnant with her third child in October 2023. (*Id.* ¶ 59.) Laguerre testified that she was "nervous" and "scared" to tell Johnson about her third pregnancy, but she felt more comfortable about doing so after speaking with a different Paramount

supervisor. (*Id.* ¶ 60 (quotation marks omitted).) Laguerre then informed Johnson of her third pregnancy, and Johnson advised Laguerre to contact Human Resources so she could obtain the benefits afforded to her as a staff employee. (*Id.* ¶ 61.) On March 5, 2024, Johnson texted Laguerre: "[I]f you need maternity or any accommodations, we can bring in HR to make sure you are taken care of." (*Id.* ¶ 62.) However, Laguerre alleges that after telling Johnson about her third pregnancy, Johnson was "short" and "irritated" with her. (Pl.'s Response ¶ 54 (quotation marks omitted).)

Laguerre applied for maternity leave through Unum, Paramount's third-party leave administrator. (Defs.' Statement ¶ 63.) Laguerre was granted short-term disability leave beginning on June 28, 2024, and she gave birth to her third child on July 2, 2024. (*Id.* ¶¶ 64-66.) Laguerre intended to take six weeks of maternity leave and return to work in mid-August 2024. (*Id.* ¶ 67.) Laguerre was granted all of the maternity leave she intended to take. (*Id.* ¶ 68.)

However, on August 13, 2024—the day that Laguerre was scheduled to return to work following her short-term disability leave—Defendants informed her that she was being terminated. (Pl.'s Statement ¶ 61.) Laguerre was fired as part of a large-scale layoff across Paramount in August 2024. (Defs.' Statement ¶ 69.) The directive for that layoff originated from the head of Paramount, and Johnson was tasked with reducing the amount of compensation in his budget by 50%. (*Id.* ¶¶ 70-71.) After reviewing his employees' roles and wages, Johnson submitted a list of candidates for termination to his supervisor, who did not make any changes to Johnson's recommendations. (*Id.* ¶¶ 72-73.) In total, the layoff resulted in the termination of 43 employees in Johnson's department and thousands of employees across Paramount departments. (*Id.* ¶¶ 75, 83.)

The parties dispute whether Johnson's selections for termination took into consideration job function, the ability for certain roles to be absorbed by the surviving workforce, and the decrease in work volume in his department. Defendants allege that considerations such as responsibility absorption and decreased workflow played a role in Johnson's selections for termination. (*Id.* ¶ 76; ECF No. 56-1 at 47-51.) Defendants point out that another Paramount employee, Joe Zucker, assumed all of Laguerre's former responsibilities, and Laguerre's former responsibilities constitute between 25% and 33% of Zucker's current responsibilities. (Defs.' Statement ¶¶ 80-81.)

Laguerre denies that such considerations played a role in Johnson's firing decisions, and she further denies that the assistant position was rendered unnecessary, citing evidence that Defendants began interviewing individuals to conduct her tasks while she was on maternity leave, that Zucker was hired as a temporary employee to fulfill her assistant responsibilities during her maternity leave, and that the reason for the work order governing Zucker's hiring and employment was listed as "Long-term Coverage (3+ weeks to cover Leave of Absence or extended time off." (Pl.'s Response ¶ 76; *see also* ECF No. 56-3 at 303, 431; ECF No. 56-1 at 187-88; ECF No. 56-7.)

**4. Similarities With Fugazy's Parental History and Maternal Leave**

Finally, Laguerre draws parallels to the parental history and maternal leave of Fugazy, Johnson's prior assistant. (*See* Pl.'s Statement ¶¶ 34-40.) Defendants do not deny any allegations pertaining to Fugazy's parental history and maternity leave, which are supported by Fugazy's deposition testimony and uncontroverted by Defendants' factual allegations.

Johnson asked Fugazy whether she intended to start a family with her husband while she was interviewing for the assistant position. (Pl.'s Statement ¶ 35; *see also* ECF No. 56-4 at 23.) After Fugazy had her first child, Johnson asked her several times whether she intended to have

additional children. (Pl.'s Statement ¶ 37.) And because Fugazy experienced some brain fog during her first pregnancy, Johnson would ask if Fugazy was pregnant upon subsequent bouts of forgetfulness. (*Id.* ¶ 38; *see also* ECF No. 56-4 at 26-27, 119-20.) Fugazy testified that Johnson's comments were "red flag[s]" that made her "nervous of telling him that I was pregnant again the second time." (ECF No. 56-4 at 27.) Fugazy later became pregnant with her second child. (Pl.'s Statement ¶ 39.) Fugazy was terminated during her second pregnancy. (*Id.* ¶ 40; *see also* ECF No. 56-4 at 24.)

**B. Procedural Background**

On November 4, 2024, Defendants received correspondence from counsel for Laguerre, which enclosed a draft complaint asserting claims against Defendants. (ECF No. 37 ¶ 3.) Laguerre then officially commenced this action by filing her complaint on January 30, 2025. (ECF No. 1.) Defendants filed their answer on May 8, 2025, pleading, *inter alia*, the affirmative defense of Laguerre's failure to mitigate damages. (ECF No. 13 at 11.) On July 7, 2025, Laguerre sent her initial disclosures to Defendants pursuant to Federal Rule of Civil Procedure 26. (ECF No. 37-6.) In her initial disclosures, under "Damages," Laguerre listed: "backpay . . . for the period of time following her termination when she was without work," and "frontpay for a reasonable period of time following a judgment in her favor." (*Id.* at 4.) And under "Relevant Documents," Laguerre listed "Documentation of Plaintiff's mitigation efforts." (*Id.* at 3.)

On June 13, 2025, Defendants served Laguerre with interrogatories and requests for production. (ECF Nos. 37 ¶¶ 5-6, 37-2, 37-3.) On July 16, 2025, Laguerre served responses to Defendants' interrogatories and requests for production. (ECF Nos. 37-4, 37-5.) In her interrogatory responses, Laguerre once again included backpay and frontpay as categories of her sought damages. (ECF No. 37-5 at 6-7.) And in response to Defendants' request for production of "all documents and communications concerning Plaintiff's effort to secure employment . . .

since the end of Plaintiff's employment with Paramount," Laguerre represented that she had "produced all non-privileged responsive documents in her possession." (ECF No. 37-4 at 17.)

On December 17, 2025, Defendants deposed Laguerre. (ECF No. 37-1.) Laguerre testified that she began to look for alternate employment beginning in December 2024. (*Id.* at 148-49.) Ultimately, Laguerre started new employment with Endeavor Air on January 27, 2025, approximately two months after her termination from Paramount. (*Id.* at 143.)

Laguerre testified that her job hunt entailed twenty to fifty job applications, and that she kept records of those applications in two email accounts, one of which she recently made to catalog her job applications. (*Id.* at 151-52, 155-59.) Despite Laguerre's representation that she produced all documents and communications pertaining to her job hunt in her responses to Defendants' requests for production (*see* ECF No. 37-4 at 17), Laguerre admitted in her deposition that she had not searched either email account for documents responsive to Defendants' requests for production (ECF No. 37-1 at 157). Defendants then renewed their request for Laguerre to produce her email applications. (*Id.* at 158.)

On January 7, 2026, Laguerre returned for the second day of her deposition. (*Id.* at 316.) Laguerre testified that she was unable to locate her job applications on her email accounts because she had "cleared out" her inbox for storage purposes. (*Id.* at 322-25.) Laguerre could not estimate the number of emails she had deleted as her methodology was indiscriminate: she "just went down the list of delete, delete, delete." (*Id.* at 326-27.) Nevertheless, Laguerre was certain that at least some of the emails she deleted pertained to her job search following her termination from Paramount. (*Id.* at 327.) Following her mass deletions, Laguerre was able to name only a fraction of the twenty to fifty companies to which she had allegedly applied, and she could provide documentation for only four such applications. (*Id.* at 352-56; ECF No. 37 ¶ 10.)

On March 27, 2026, after counsel for Laguerre obtained the login credentials for Laguerre's email accounts, Laguerre was able to locate and produce additional documents related to her post-termination job search. (ECF No. 46 ¶¶ 6, 9; ECF No. 46-5.). Thus, in total, Laguerre has produced documentation of applications to eleven companies. (ECF No. 44 at 8.)

On March 19, 2026, Defendants filed a motion for sanctions against Laguerre for deleting the email records of her post-termination job applications (ECF No. 35), accompanied by a supporting memorandum of law (ECF No. 36). Laguerre filed an opposition on April 24, 2026. (ECF No. 44.) Defendants filed a reply in further support of sanctions on May 7, 2026. (ECF No. 49.) And on April 16, 2026, Defendants filed a motion for summary judgment on all of Laguerre's claims (ECF No. 40), accompanied by a supporting memorandum of law (ECF No. 41). Laguerre filed an opposition on May 21, 2026. (ECF No. 52.) Defendants filed a reply in further support of summary judgment on June 11, 2026. (ECF No. 62.)

## II. Legal Standards

### A. Discovery Sanctions

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *ELG Utica Alloys, Inc. v. Niagara Mohawk Power Corp.*, 144 F.4th 360, 374 (2d Cir. 2025) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)). Federal Rule of Civil Procedure 37(e) "governs spoliation of electronically stored information ('ESI'), which includes the electronic databases and emails at issue here." *Medcenter Holdings Inc. v. Web MD Health Corp.*, 692 F. Supp. 3d 81, 89 (S.D.N.Y. 2023), *amended on reconsideration*, 734 F. Supp. 3d 303 (S.D.N.Y. 2024).

"Courts in the Second Circuit apply a three-part test to determine the propriety of sanctions under Rule 37(e)." *Health & Happiness (H&H) US LLC v. Nutramax Lab'ys, Inc.*, No.

23-CV-10849, 2026 WL 836132, at *5 (S.D.N.Y. Mar. 26, 2026). First, courts ask whether the non-moving party "failed to take reasonable steps to preserve electronically stored information that should have been preserved in the anticipation or conduct of litigation." *Karsch v. Blink Health Ltd.*, No. 17-CV-3880, 2019 WL 2708125, at *13 (S.D.N.Y. June 20, 2019) (quotation marks omitted). Second, courts must determine whether "there has been prejudice to another party from loss of the information, in which case the Court may order measures no greater than necessary to cure the prejudice." *Id.* (quotation marks omitted). Third, courts consider "whether the destroying party acted with the intent to deprive another party of the information's use in the litigation, in which event a court may consider whether to impose the most severe of measures such as mandatory presumptions or instructions that the lost information was unfavorable or the entry of default judgment." *Id.* (quotation marks omitted). "[A] party seeking sanctions under Rule 37(e)(2) must establish the requisite elements—including that the party act[ed] with 'intent to deprive'—by a preponderance of the evidence." *Hoffer v. Tellone*, 128 F.4th 433, 440 (2d Cir. 2025).

### B. Summary Judgment

Rule 56(a) permits summary judgment only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are material where they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party." *Jackson v. Am. C.L. Union, Inc.*, No. 21-CV-5037, 2024 WL 4766983, at *6 (S.D.N.Y. Nov. 13, 2024) (citing *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)). The Court must "resolve all ambiguities and draw all permissible inferences in favor of the [non-movant]." *Friend*, 61 F.4th at 84 (quotation marks omitted).

"The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact." *Thorpe v. City of New York*, No. 19-CV-5995, 2021 WL 3811238, at *4 (S.D.N.Y. Aug. 25, 2021) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Once such a showing has been made, the non-moving party must present 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting Fed. R. Civ. P. 56(e)). In cases involving employment discrimination or retaliation, "an extra measure of caution is merited" before granting summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (quotation marks omitted). Still, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation." *Jackson*, 2024 WL 4766983, at *6 (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000)). "Thus, even in a discrimination case, 'a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment,' and may not rely solely upon 'their own self-serving testimony.'" *Id.* (first quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), then quoting *Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009) (summary order)).

## III. Discussion

### A. Discovery Sanctions

Defendants seek an adverse inference instruction, mandating the jury to infer that Laguerre's deleted job search emails would have been unfavorable to Plaintiff's claim that she mitigated her damages. (*See* ECF No. 36 at 20-25.) Defendants ground their request for such an adverse instruction on Rule 37(e)(2) or, alternatively, the Court's inherent authority to fashion sanctions for abuse of the judicial process. (*Id.*) Additionally, Defendants seek an award of costs and attorney's fees in connection with their motion for sanctions. (*Id.* at 24-25.)

At the outset, Defendants cannot rely on the Court's inherent authority as the basis for seeking an adverse inference instruction. Of course, federal courts wield "inherent powers," including "the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Barbera v. Grailed, LLC*, No. 24-CV-3535, 2025 WL 2098635, at *10 (S.D.N.Y. July 25, 2025) (quoting *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44-45 (1991)) (alteration adopted). But "the inherent power of lower federal courts can be limited by statute and rule, for 'these courts were created by act of Congress.'" *Chambers*, 501 U.S. at 47 (quoting *Ex parte Robinson*, 86 U.S. 505, 511 (1873)) (alteration adopted). This Court is therefore unable to "rely on its supervisory power as a means of circumventing the clear mandate of a procedural rule." *Id.* at 51.

"Rule 37(e) as amended in 2015 constitutes such a 'clear mandate.'" *Barbera*, 2025 WL 2098635, at *10. Rule 37(e) "specifies the findings necessary to justify" the harshest of sanctions, including the adverse inference instruction Defendants seek here. Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment; *see also* Fed. R. Civ. P. 37(e)(2) (allowing courts to "instruct the jury that it may or must presume the information was unfavorable to the [spoliating] party" "*only* upon finding that the party acted with the intent to deprive" (emphasis added)). Accordingly, Rule 37(e) "forecloses reliance on inherent authority . . . to determine when certain measures should be used." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment; *see also Gregory v. Montana*, 118 F.4th 1069, 1079 (9th Cir. 2024) ("Given Rule 37(e)'s careful specification of the findings that *must* be made before any sanction may be imposed for a covered loss of information, it is clear that the rule, by its terms, precludes a court from resorting to inherent authority to evade its strictures."); *Hoffer*, 128 F.4th at 438 ("A party's

acting negligently or knowingly will not suffice to justify the sanctions enumerated in Rule 37(e)(2).”). Defendants’ motion for discovery sanctions thus rises or falls with Rule 37(e).

**1. Prejudice to Defendants**

First, Rule 37(e) asks whether Laguerre “failed to take reasonable steps to preserve electronically stored information that should have been preserved in the anticipation or conduct of litigation.” *Karsch*, 2019 WL 2708125, at *13 (quotation marks omitted). Defendants easily satisfy this first inquiry. Laguerre anticipated this litigation when she deleted her job search applications. She testified that she began deleting her job search application emails in December 2024 (ECF No. 56-3 at 331), *after* her counsel sent a draft complaint asserting claims against Defendants in early November (ECF No. 37 ¶ 3). *Accord Nurmagomedov v. Legionfarm, Inc.*, No. 23-CV-6683, 2024 WL 4979235, at *3 (S.D.N.Y. Dec. 4, 2024) (finding plaintiff was under duty to preserve evidence after sending demand letter to defendants); *Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570, 581 (S.D.N.Y. 2017) (same). Further, Laguerre clearly did not take reasonable steps to preserve ESI that should have been preserved. Laguerre admits that she deleted emails documenting her job search applications (ECF No. 56-3 at 322-25), which her initial disclosures conceded to be relevant to her mitigation efforts (ECF No. 37-6 at 3). Laguerre’s volitional act of deleting her job search applications falls far below her duty to reasonably preserve relevant ESI. *Accord Barbera*, 2025 WL 2098635, at *7 (“Thus, far from merely failing to take reasonable steps to preserve ESI, Plaintiff intentionally deleted relevant documents.” (cleaned up)).

Second, Rule 37(e) asks whether “there has been prejudice to another party from loss of the information, in which case the Court may order measures no greater than necessary to cure the prejudice.” *Karsch*, 2019 WL 2708125, at *13 (quotation marks omitted). The Court has little trouble finding that Defendants have been prejudiced by the deletion of Laguerre’s job

search applications. Plaintiffs asserting employment discrimination claims must "use reasonable diligence in finding other suitable employment." *Clarke v. Frank*, 960 F.2d 1146, 1152 (2d Cir. 1992) (emphases omitted). The deletion of Laguerre's emails precludes Defendants from testing the diligence of Laguerre's mitigation efforts, including investigating "how diligently she pursued leads and responded to inquiries, or whether she turned down opportunities." (ECF No. 36 at 16.)

Laguerre argues that her deletion of job search applications could not have prejudiced Defendants because she has produced "over 60 pages of mitigation documentation," and "possession of *even more* evidence of Plaintiff's mitigation efforts could [not] possibly benefit [Defendants]." (ECF No. 44 at 12-13.) But Laguerre fails to recognize that employees' conduct in their post-termination job search may reduce the damages to which they are entitled. For example, a terminated employee's rejection of a substantially similar job may toll her entitlement to backpay. *See, e.g.*, *Taylor v. Polygram Recs.*, No. 94-CV-7689, 1999 WL 124456, at *25-26 (S.D.N.Y. Mar. 8, 1999) (limiting terminated employee's entitlement to backpay to period from her termination to her rejection of comparable employment). The prejudice arising from Laguerre's deleted emails is magnified by the fact that Laguerre testified that she indeed received and rejected offers of employment from at least one potential employer. (*See* ECF No. 56-3 at 163.)

Next, Laguerre argues that Defendants suffered no prejudice from the deletion of her job search applications because "Plaintiff's counsel was able to locate and produce evidence of at least 14 additional job applications in March 2026." (ECF No. 44 at 13.) But Laguerre testified that she submitted twenty to fifty job applications (ECF No. 56-3 at 151), leaving between six and thirty-six job applications missing. In her opposition, Laguerre argues that "*many*"—but not

*all*—"of the specific job applications that Plaintiff was unable to locate have now been located and produced." (ECF No. 44 at 8 (emphasis added).) Thus, prejudice remains in the form of an evidentiary gap—albeit a smaller one following Laguerre's later production—between Laguerre's testimony and her production as a result of the deletion of her job search applications.

**2. Intent to Deprive**

Third, in determining the propriety of the harsh sanction of an adverse inference instruction, Rule 37(e)(2) looks to "whether the destroying party acted with the intent to deprive another party of the information's use in the litigation." *Karsch*, 2019 WL 2708125, at *13 (quotation marks omitted). Because the destruction of evidence "leaves few traces upon deletion," *Resnik v. Coulson*, No. 17-CV-676, 2019 WL 1434051, at *9 (E.D.N.Y. Mar. 30, 2019), parties seeking sanctions under Rule 37(e) may "[p]rov[e] specific intent of spoliation . . . [through] 'circumstantial evidence,'" *Ronen v. RedRoute, Inc.*, No. 21-CV-2732, 2025 WL 2790808, at *6 (E.D.N.Y. June 16, 2025) (quoting *Hoffer*, 128 F.4th at 440). However, the movant must "demonstrate that the spoliating party acted with the intent to deprive, not merely the intent to destroy." *Health and Happiness*, 2026 WL 836132, at *6 (quoting *Doubleline Cap. LP v. Odebrecht Fin., Ltd.*, No. 17-CV-4576, 2021 WL 1191527, at *8 (S.D.N.Y. Mar. 30, 2021)). Accordingly, "[a] party's acting negligently or knowingly will not suffice to justify the sanctions enumerated in Rule 37(e)(2)." *Hoffer*, 128 F.4th at 438.

Here, while Defendants have readily demonstrated that Laguerre intended to delete her job search application emails, the circumstantial evidence offered by Defendants does not establish that Laguerre's email deletions were done with the intent to *deprive* Defendants of the deleted information—rather than merely an intent to *destroy* paired with negligence or carelessness—by a preponderance of the evidence.

"To be sure, at least some circumstantial evidence supports" finding that Laguerre acted with the intent to deprive. *Barbera*, 2025 WL 2098635, at *8. The deleted job search applications "could fairly be supposed to have been material" to Laguerre's mitigation efforts; Laguerre "engaged in an affirmative act" in the form of volitionally deleting her application emails, "causing the evidence to be lost"; and Laguerre deleted her emails "while [she] knew or should have known of [her] duty to preserve the evidence." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. 474, 496 (S.D.N.Y. 2022) (quoting *Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*, 337 F.R.D. 47, 67 (S.D.N.Y. 2020)).

But the Court does not find that "the data loss could not be 'credibly explained' other than by bad faith.'" *StoneX Grp., Inc. v. Shipman*, No. 23-CV-00613, 2024 WL 1509346, at *11 (S.D.N.Y. Feb. 5, 2024) (quoting *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, No. 13-CV-2581, 2021 WL 4190628, at *18 (S.D.N.Y. Aug. 18, 2021)), *report and recommendation adopted*, No. 23-CV-00613, 2024 WL 3356989 (S.D.N.Y. July 10, 2024). Laguerre has consistently explained that she engaged in the email deletions at issue to preserve space in her inbox after her email service provider informed her that she was out of free email storage. (*See, e.g.*, ECF No. 56-3 at 323-25; *see also* ECF No. 45 ¶¶ 11-12.) True, Laguerre deleted emails both in her older, general inbox, as well as a newer (and presumably emptier) inbox made specifically for her job search. (ECF No. 56-3 at 387-88.) But it certainly could have been negligence—rather than an intent to deprive—that led Laguerre to absentmindedly delete emails from both inboxes while reviewing the inboxes in a combined or "collide[d]" view. (*Id.* at 387.) "Absent additional evidence . . . the Court cannot conclude that the specific reason Plaintiff

deleted documents here was to prevent Defendant from using them in this litigation." *Barbera*, 2025 WL 2098635, at *8.[4]

### 3. Lesser Sanctions

The Court finds that other, lesser sanctions more appropriately remedy Laguerre's spoliation. *See S.E.C. v. Smith*, 710 F.3d 87, 98 (2d Cir. 2013) ("[D]istrict courts are given broad discretion in tailoring appropriate and reasonable sanctions." (quotation marks omitted)). Indeed, the Advisory Committee Notes specifically contemplate lesser sanctions, such as "forbidding the party that failed to preserve information from putting on certain evidence" and "permitting the parties to present evidence and argument to the jury regarding the loss of information" under Rule 37(e)(1). Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.

Those lesser sanctions are appropriate here, as they are "no greater than necessary to cure the prejudice" that has inured to Defendants as a product of Laguerre's spoliation. Fed. R. Civ. P. 37(e)(1). "Accordingly, it is appropriate to preclude Plaintiff from testifying (in court or through a declaration or affidavit in response to a summary judgment motion)" that she has engaged in any additional mitigation efforts beyond the job search applications she produces to

[4] Even if the Court were to find that Laguerre acted with the intent to deprive, the Court would not be obligated to issue an adverse inference instruction. *See Health & Happiness*, 2026 WL 836132, at *6 ("The sanctions permitted under Rule 37(e)(2)—after a finding of intent to deprive has been made—are particularly harsh, and courts should exercise caution in using them." (cleaned up)); Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment ("Courts should exercise caution . . . in using the measure specified in (e)(2). Finding an intent to deprive . . . does not require a court to adopt any of the measures listed in subdivision (e)(2)."). Here, the harsh sanction of an adverse inference instruction is not commensurate with the circumstances. This is not a case in which Defendants have been wholly deprived of the kind of evidence they seek: Laguerre provided "60 pages of job search records documenting her applications to at least 13 jobs." (ECF No. 44 at 10.) While that is not the full universe of production to which Defendants were entitled, the residual evidentiary gap is more congruently resolved through the lesser sanctions of allowing Defendants to present evidence of Laguerre's spoliation and precluding Laguerre from testifying to any additional mitigation efforts.

Defendants. *Barbera*, 2025 WL 2098635, at *11. Additionally, "Defendant[s] will be permitted to present evidence to the jury regarding the lost documents and may move for instructions to assist the jury's evaluation of the evidence." *Id.* (citation omitted).[5]

**B. Summary Judgment**

Defendants move for summary judgment on the following claims: (1) Laguerre's FLSA and NYLL claims for overtime pay; (2) Laguerre's NYLL claims for deficient wage notices; (3) Laguerre's FMLA interference claims; (4) Laguerre's FMLA and NYLL retaliation claims; and (5) Laguerre's NYCHRL and NYSHRL discrimination claims.

**1. FLSA and NYLL Overtime Claims**

**a. Legal Standard**

"Courts use the same burden-shifting framework to determine liability for unpaid overtime under the NYLL [and the FLSA]." *Garcia v. JonJon Deli Grocery Corp.*, No. 13-CV-8835, 2015 WL 4940107, at *4 n.8 (S.D.N.Y. Aug. 11, 2015); *see also Cortez v. Brand Name 99 Cents & Up Corp.*, No. 24-CV-5262, 2025 WL 1251297, at *7 (S.D.N.Y. Apr. 30, 2025). First, "an employee must prove that he 'performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work.'" *Id.* at *4 (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 361 (2d Cir. 2011)). "The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Scott v. City of New York*, 629 F. Supp. 2d 266, 269 (S.D.N.Y. 2009) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946)).

---

[5] In light of the Court's award of non-monetary sanctions to Defendants, the Court declines to exercise its discretion and grant additional monetary sanctions.

Importantly, to survive summary judgment, a plaintiff need only demonstrate that a "genuine issue of fact exists as to whether *some* uncompensated work was performed, defendants knew of this work, and a reasonable basis exists for calculating the amount of that work." *Sherald v. Embrace Techs., Inc.*, No. 11-CV-939, 2013 WL 126355, at *6 (S.D.N.Y. Jan. 10, 2013) (citing *Kuebel*, 643 F.3d at 365)). Thus, "a defendant is not entitled to summary judgment . . . simply because the plaintiff has not precisely quantified the amount of uncompensated work he has performed." *Id.*; *see also Kuebel*, 643 F.3d at 364 (holding any "dispute as to the precise amount of . . . uncompensated work is one of fact for trial").

**b. Analysis**

First, a genuine issue of material fact exists as to whether Laguerre performed uncompensated overtime work. Laguerre's communications with Johnson show that Johnson frequently required Laguerre to work outside of her usual 10:00am to 6:00pm schedule. (*See, e.g.*, ECF No. 56-12 at 2-3, 5-6, 13, 33, 84, 85.) Further, Laguerre produced documents demonstrating various two-week intervals in which she worked outside of her scheduled workweek but received no overtime pay. (Pl.'s Statement ¶¶ 19-33.) Defendants argue that this evidence is insufficient to raise a fact issue because Laguerre "routinely took large portions of the workday to attend to personal matters." (ECF No. 41 at 20-21.) But unlike the case law cited by Defendants, Laguerre never "acknowledged . . . that her regularly scheduled hours" fell below the "40-hour threshold for overtime." *Contrast Velazquez v. Yoh Servs., LLC*, 803 F. App'x 515, 518 (2d Cir. 2020) (summary order). On this disputed record, Defendants' evidence "suggest[ing] that [Laguerre] typically worked *less* than forty hours a week" constitutes "a factual issue for trial," not grounds for summary judgment. *Kuebel*, 643 F.3d at 365.

Second, Laguerre raises a triable fact issue as to whether Defendants had knowledge of her overtime work. Again, Johnson directed Laguerre to engage in work beyond her scheduled workweek. (*See, e.g.*, ECF No. 56-12 at 2-3, 5-6, 13, 33, 84, 85.) Drawing all inferences in favor of Laguerre as the non-moving party, *see Friend*, 61 F.4th at 84, Johnson's directives to Laguerre manifest his knowledge that she was working beyond her scheduled hours—and therefore, that she was working unpaid overtime. Additionally, in his deposition, Johnson admitted that Laguerre's reported hours "probably [were] not accurate enough," and that even if he "knew that she had worked more than ten to six," he "would not change [her] timecard." (ECF No. 56-1 at 90-91.) Because Johnson "observe[d]" and was "aware" of Laguerre's overtime labor, the Court "impute[s] knowledge to [Paramount]." *Foster v. City of New York, New York*, No. 14-CV-4142, 2017 WL 11591568, at *20 (S.D.N.Y. Sept. 30, 2017), *abrogated on other grounds by Perry v. City of New York*, 78 F.4th 502 (2d Cir. 2023). Thus, Johnson's testimony and instructions to Laguerre raise a triable issue as to Defendants' actual knowledge of Laguerre's overtime work.

Defendants seek refuge in *Perry v. City of New York*, in which the Second Circuit held that an employer who establishes a "reasonable process for an employee to report" their work hours "will not ordinarily be chargeable with constructive knowledge of unreported work." 78 F.4th at 513 (quoting *Allen v. City of Chicago*, 865 F.3d 936, 938 (7th Cir. 2017)). However, Defendants fail to reckon with the next sentence of *Perry*: "But we have long recognized that an employee's failure to report work the employer in fact knew about or required does not protect the employer from . . . liability." *Id.* Defendants' actual knowledge of Laguerre's overtime work renders a foray into Defendants' constructive knowledge as informed by Defendants' time-reporting system unnecessary. *See id.* at 515 ("The employer cannot stand idly by and allow

plaintiff[] to perform overtime work without proper compensation, even if the plaintiff[] did not claim overtime compensation." (cleaned up)).

Third, Laguerre "has presented sufficient evidence for a reasonable jury to conclude that [s]he has shown the amount of [her] uncompensated work 'as a matter of just and reasonable inference.'" *Kuebel*, 643 F.3d at 364 (quoting *Anderson*, 328 U.S. at 687). In her declaration, Laguerre avers that Johnson contacted her before her work hours "nearly every morning" and after her work hours "at least twice per week." (ECF No. 55 ¶¶ 13-14.) Laguerre estimates that she would spend between "five minutes to 30 minutes" on each of Johnson's tasks outside of her schedule. (*Id.* ¶ 15.) "While this evidence is not precise, [Laguerre's] burden under *Anderson* is . . . not onerous." *Kuebel*, 643 F.3d at 364 (holding plaintiff raised fact issue when plaintiff "estimate[d] that he averaged one to five hours of uncompensated overtime each week" and "described his method of shaving Friday's hours so that his weekly total did not exceed forty").

Defendants would have this Court disregard the sworn facts in Laguerre's declaration based on alleged inconsistencies between her deposition testimony and her declaration, namely Laguerre's inability to identify the number of her unpaid hours at her deposition. (ECF No. 62 at 2-4.) The Court declines to disregard Laguerre's sworn testimony on this basis alone. Any discrepancy between Laguerre's deposition testimony and declaration is "the type of inconsistency that the defendant[s] should test through cross-examination at trial and allow the jury to weigh in determining the credibility of the plaintiff's testimony in support of [her] claims." *Kuebel*, 643 F.3d at 355 (quoting *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1317 (11th Cir. 2007)) (cleaned up).

Because Laguerre raises a genuine issue of material fact as to every element of her overtime claims,[6] the Court denies Defendants' motion for summary judgment as to her NYLL and FLSA overtime claims.

**2. NYLL Wage Notice Claims**

**a. Legal Standard**

NYLL § 195 requires employers to provide wage notices to their employees to relay certain information about the terms of employment. Employers must obtain signed and dated written acknowledgement of receipt of wage notices, which employers must preserve and maintain for six years. NYLL § 195(1)(a). Employers are required to provide notices at the time of hiring, whenever any changes to the information contained in the notice transpire, and with every paycheck. *Id.* § 195(1)-(3). The information listed in wage notices must be accurate; "a plaintiff 'adequately states a cause of action for violations of § 195 based on allegations' that the wage notices furnished 'did not accurately reflect his wages and deductions.'" *Lambert v. New Start Cap. LLC*, 799 F. Supp. 3d 258, 290 (S.D.N.Y. 2025) (quoting *Okeke v. Interfaith Med. Ctr.*, 205 N.Y.S.3d 440, 442-43 (2d Dep't 2024)), *appeal withdrawn*, No. 25-2160, 2026 WL 654284 (2d Cir. Feb. 27, 2026).

**b. Analysis**

Defendants argue that they are entitled to summary judgment on Laguerre's wage notice claims because Defendants provided Laguerre with "multiple compliant wage notices," and Laguerre was "unable to identify any deficiency whatsoever in the notices she received." (ECF

[6] Defendants fail to "come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from [Laguerre's] evidence." *Scott*, 629 F. Supp. 2d at 269 (quotation marks omitted). Accordingly, the satisfaction of the elements of Laguerre's affirmative claim suffices to preclude summary judgment.

No. 41 at 22.) Laguerre counters that Defendants failed to provide her with certain required wage notices, and when Defendants did provide wage notices, they contained incorrect wage information. (ECF No. 52 at 32.)

Neither party briefed Laguerre's Article III standing to raise her wage notice claims. Nevertheless, the Court must examine those constitutional parameters *sua sponte* to ensure that the Court possesses jurisdiction of Laguerre's wage notice claims. *Sharkey v. Quarantillo*, 541 F.3d 75 (2d Cir. 2008) (courts are "required to raise" threshold jurisdictional issues *sua sponte*) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)); *see also Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005) ("Because the standing issue goes to this Court's subject matter jurisdiction, it can be raised *sua sponte*.").

To allege a sufficiently concrete injury-in-fact under NYLL § 195, "a plaintiff must show some causal connection between the lack of accurate notices and [a] downstream harm," as a statutory claim "'divorced from any concrete harm' . . . do[es] 'not suffice for Article III standing.'" *Guthrie v. Rainbow Fencing Inc.*, 113 F.4th 300, 306, 308 (2d Cir. 2024) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 440 (2021)). Where the plaintiff "has plausibly shown that defective notices led him or her to lose wages," the plaintiff satisfies Article III standing. *Id.* at 310. Conversely, a plaintiff lacks standing under § 195 where her alleged harms sound in "speculation and conjecture" based on what "*could* result from an employer's failure to provide wage notices and wage statements." *Id.* at 309-10.

Here, Laguerre has not established Article III standing for her § 195 claims. True, her complaint alleges that had she "received the legally required wage notices and wage statements, she would have sought recovery of her unpaid overtime compensation sooner." (ECF No. 1

¶ 19.) But Laguerre's contention that accurate wage notices would have accelerated her attempt to recoup her unpaid overtime pay cannot be squared with the record. Laguerre concedes that the documents governing her employment as a regular staff member included an overtime rate. (Pl.'s Resp ¶ 14.) Indeed, Laguerre testified that, at least as a temporary employee, she submitted timecards reflecting overtime work, and Johnson approved those timecards. (*Id.* ¶¶ 9, 10.) And Laguerre concedes that Johnson twice instructed her to enter any overtime. (*Id.* ¶ 22.)

The Court understands Laguerre's position that, notwithstanding these notices of her technical overtime eligibility, she was practically foreclosed from submitting and being paid for any overtime work due to her training and the office culture regarding overtime compensation. (*See id.*; ECF No. 56-3 at 61-64; ECF No. 56-4 at 30-34.) But Laguerre does not explain why accurate wage notices, which may have reinforced her existing knowledge of her *technical* overtime eligibility, would have made a difference in her *practical* ability or willingness to pursue overtime compensation. Put differently, Laguerre fails to sufficiently demonstrate a causal connection between the allegedly deficient wage notices and her downstream harm, as she has not shown that she "would have undertaken such advocacy and plausibly would have avoided some actual harm or obtained some actual benefit if accurate notices had been provided." *Guthrie*, 113 F.4th at 308; *see also Giancotti v. Pizzarotti LLC*, No. 23-CV-3457, 2025 WL 2607606, at *18 (S.D.N.Y. Sept. 9, 2025).

Any deficiencies in Laguerre's Article III standing would deprive this Court of subject matter jurisdiction over Laguerre's § 195 claims. But because the Court raised the standing issue *sua sponte*, the Court orders Laguerre to show cause, with supporting evidence, by August 28, 2026, as to why her wage notice and statement claims should not be dismissed for lack of subject matter jurisdiction. *See Kasseris v. ZA & D Serv. Station, Inc.*, No. 23-CV-06281, 2026 WL

84037, at *18 (E.D.N.Y. Jan. 12, 2026) (ordering the same); *see also McGinty v. New York*, 251 F.3d 84, 90 (2d Cir. 2001) ("[A] *sua sponte* dismissal absent notice and an opportunity to be heard can itself be grounds for reversal.").

**3. FMLA Interference Claims**

**a. Legal Standard**

"A plaintiff bears the burden of establishing only a prima facie case for interference claims, and the court need not consider the issue of the employer's intent." *Game v. Lafayette Glass Co., Inc.*, No. 23-CV-7833, 2025 WL 2782850, at *7 (E.D.N.Y. Sept. 30, 2025) (citing *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 176 (2d Cir. 2006)). To establish a prima facie case for FMLA interference, the plaintiff must show "1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA." *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016).

Under the FMLA, an employee is entitled not only to "12 workweeks of leave . . . [b]ecause of the birth of a son or daughter of the employee," but also "to be *restored*" to the same or equivalent position upon her return. 29 U.S.C. §§ 2612(a)(1), 2614(a)(1) (emphasis added); *see also Woods v. START Treatment & Recovery Centers, Inc.*, 864 F.3d 158. 166 (2d Cir. 2017) ("An employee has the right to return to the position she held before taking leave, or to an equivalent position." (quotation marks omitted)).

However, "the right to reinstatement under the FMLA is not absolute." *Barger v. First Data Corp.*, 851 F. App'x 278, 280 (2d Cir. 2021) (summary order). "An employee has no greater right to reinstatement . . . than if the employee had been continuously employed during the FMLA leave period." 29 C.F.R. § 825.216(a). Accordingly, an employer may properly

"deny restoration to employment" where "an employee would not otherwise have been employed at the time reinstatement is requested." *Id.* "A *bona fide* reduction in workforce is a legitimate nondiscriminatory reason for terminating an employee." *James v. New York Racing Ass'n*, 76 F. Supp. 2d 250, 256 (E.D.N.Y. 1999), *aff'd*, 233 F.3d 149 (2d Cir. 2000). The employer bears the burden of proof that even if the employee had not taken leave, the "employee would have been laid off during the FMLA leave period and, therefore, would not be entitled to restoration." 29 C.F.R. § 825.216(a)(1); *see also Barger*, 851 F. App'x at 281.

**b. Analysis**

First, Laguerre raises a prima facie case of interference under the FMLA. Laguerre worked full-time for Defendants since July 2019 and therefore qualifies as an employee under the FMLA. 29 U.S.C. § 2611(2)(A) (defining employee as a person employed "for at least 12 months by the employer" and "for at least 1,250 hours of service with such employer during the previous 12-month period"). Paramount, an international media conglomerate, is an employer covered by the FMLA. *Id.* § 2611(4)(A)(i) (defining employer as "any person . . . in any industry or activity affecting commerce who employs 50 or more employees for each working day during . . . 20 or more calendar workweeks in the current or preceding calendar year"). And Johnson, individually, is also an employer under the FMLA in light of his "power to hire and fire . . . employees" and his "supervis[ion] and control[]" of "employee work schedules or conditions of employment." *Graziadio*, 817 F.3d at 422. Laguerre was entitled to leave under the FMLA to give birth to and raise her child, and Defendants concede that Laguerre properly gave notice to Paramount's third-party leave administrator prior to taking leave. (*See* ECF No. 41 at 14.) Finally, by demonstrating that Defendants "failed to reinstate [Laguerre] . . . to her original position or an equivalent position" after she returned from leave, *Game*, 2025 WL 2782850, at

*8, Laguerre has sufficiently pled that "she was denied benefits to which she was entitled under the FMLA," *Graziadio*, 817 F.3d at 424.

Defendants contend that they are nevertheless entitled to summary judgment on Laguerre's interference claim because "Plaintiff cannot establish that her FMLA leave was a 'negative factor' in the decision to terminate her," as "[t]he undisputed evidence establishes that Plaintiff's position was eliminated as a part of a Company-wide reduction in force." (ECF No. 41 at 25 (quoting *Sista*, 445 F.3d at 176).)

As an initial matter, Defendants misplace the burden of proving their "affirmative defense" on Laguerre. *Spakes v. Broward Cnty. Sheriff's Off.*, 631 F.3d 1307, 1310 (11th Cir. 2011). Under the FMLA, Laguerre does not bear the onus of demonstrating that she would *not* have been fired had she forsaken her statutorily sanctioned leave; it is Defendants who must "prove[] by the preponderance of the evidence that the plaintiff would have been terminated even if [s]he had not been on leave." *Barger*, 851 Fed. App'x at 281 (quotation marks omitted).

Having established that Defendants carry the burden of proof for their affirmative defense, the Court concludes that Defendants have failed to demonstrate that no genuine issue of material fact exists as to that defense. While it is undisputed that Laguerre's termination was part of a larger layoff in Paramount and within Johnson's department, Laguerre raises a fact issue regarding whether her decision to take leave was a "negative factor" in Defendants' decision to terminate her. *Sista*, 445 F.3d at 176; *see also Herrera v. Syracuse Univ.*, No. 24-CV-245, 2025 WL 874734, at *20 (N.D.N.Y. Mar. 20, 2025) ("[T]he Second Circuit has adopted a 'negative factor' test—*i.e.*, that the plaintiff's 'taking of FMLA leave was used as a negative factor in an employment action.'" (quoting *Woods*, 864 F.3d at 169) (alterations adopted)).

In support of their assertion that Laguerre would have been fired even if she had not taken leave, Defendants rely on Johnson's testimony that Laguerre was selected for termination because her role was unnecessary given the department's decreased workflow and absorbable by the surviving workforce. (ECF No. 56-1 at 165-66.) But Laguerre undermines Defendants' argument that her role was rendered unnecessary by demonstrating that Defendants hired a temporary employee, Joe Zucker, to cover Laguerre's assistant duties—and only her assistant duties—in the *same month* that Defendants decided to terminate Laguerre. (*See* ECF No. 56-7; ECF No. 56-16 at 38 (establishing that Laguerre's termination was "finalized early July").) While it may be true that Zucker later assumed additional responsibilities, the expansion of his work duties occurred *after* Defendants' decision to terminate Laguerre and *after* Laguerre's termination. (*See* ECF No. 56-16 at 38; ECF No. 56-8 (elevating Zucker from Executive Assistant to Operations Production Assistant on November 25, 2024).) This timeline casts doubt on whether Defendants' explanation for Laguerre's termination is legitimate, rather than "a post hoc justification for not reinstating plaintiff because the company realized her position could be adequately covered by others." *Game*, 2025 WL 2782850, at *12.

Moreover, Laguerre offers evidence showing that Johnson has a history of interrogating his female employees about whether they intend to start families and making them "very, very concerned about telling Douglas Johnson about . . . being pregnant." (ECF No. 56-4 at 23-29; *see also* ECF No. 56-3 at 224.) Indeed, after Fugazy, Johnson's assistant prior to Laguerre, had her first child, Johnson made frequent comments undermining her capacity to serve as his assistant should she become pregnant again. (*See* ECF No. 56-4 at 27 ("[I]t was always kind of, like, jokingly, 'Don't tell me that you're pregnant again.'").) Fugazy took these remarks as "red flag[s]" that made her "nervous of telling him that [she] was pregnant again the second time."

(*Id.*) Perhaps she was right to be: She was subsequently "let go while pregnant." (*Id.* at 24.) True, "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." *Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 115 (2d Cir. 2007), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). But this history of probing comments and questions, in tandem with the facts undermining Defendants' proffered justification for Laguerre's termination, raises a triable issue of fact for the factfinder. Accordingly, the Court denies summary judgment as to Laguerre's FMLA interference claims.

### 4. FMLA and NYLL Retaliation Claims

#### a. Legal Standard

Laguerre raises claims for retaliation under both the FMLA and the NYLL. Retaliation claims brought under both statutes are analyzed under the familiar *McDonnell Douglas* burden-shifting framework. *See Graziadio*, 817 F.3d at 429 ("We will analyze the retaliation claims brought pursuant to the FMLA under the burden-shifting test set forth in *McDonnell Douglas*."); *Robinson v. De Niro*, 739 F. Supp. 3d 33, 75-76 (S.D.N.Y. 2023) ("The burden-shifting standard for a retaliation claim under the NYLL is the same as that under the FLSA." (quotation marks omitted)); *Habib v. Allied Universal Exec. Prot. & Intel. Servs., Inc.*, 795 F. Supp. 3d 406, 425-26 (E.D.N.Y. 2025) (same).

"To establish a prima facie case of FMLA retaliation, a plaintiff must establish that 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Graziadio*, 817 F.3d at 429 (quoting *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 147 (2d Cir. 2012)) (alteration adopted). Once a plaintiff establishes a prima facie case of retaliation, "the defendant

must demonstrate a legitimate, non-discriminatory reason for its actions," at which point "the plaintiff must then show that defendant's proffered explanation is pretextual." *Id.*

In relevant part, NYLL § 215 prohibits an employer from "discharg[ing] . . . any employee . . . (viii) because such employee has used any legally protected absence pursuant to federal, local, or state law." NYLL § 215(1)(a). To satisfy her prima facie burden for a NYLL retaliation claim, the plaintiff must establish "(1) participation in protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Zhang v. Centene Mgmt. Co., LLC*, No. 21-CV-5313, 2023 WL 2969309, at *11 (E.D.N.Y. Feb. 2, 2023) (cleaned up).[7]

**b. Analysis**

Laguerre establishes a prima facie case of retaliation under both the FMLA and the NYLL. Under the FMLA, Laguerre easily satisfies the first three elements: (1) Laguerre exercised her right to take 12 weeks of leave during her pregnancy and following the birth of her

[7] Defendants cite one case to argue that Laguerre was "required . . . to complain about conduct that is a violation of the Labor Law in order to pursue a claim of retaliation" under NYLL § 215. *Zhang*, 2023 WL 2969309, at *11. But *Zhang* was decided before NYLL § 215 was amended in 2023 to prohibit employers from retaliating against employees for merely "us[ing] any legally protected absence." NYLL § 215(1)(a)(viii). Unlike § 215's earlier subsections, which explicitly contemplate an employee suffering retaliation for making a labor-related complaint, the plain text of § 215(1)(a)(viii) simply prohibits retaliation for taking leave. The Court declines to extend *Zhang* to § 215(1)(a)(viii) in contravention of that provision's plain text. *Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 51 (2d Cir. 2025) ("If the words are clear, we construe the statute according to their plain meaning."). To the extent that § 215's text can be construed as ambiguous, legislative history lends further support to the notion that a claim for retaliation under § 215(1)(a)(viii) does not require a predicate complaint. The Committee Report describes the 2023 amendment's as "clarifying that workers shall not be punished or subjected to discipline by employers *for lawful absences*." N.Y. Comm. Rep., 2021 N.Y. Assembly Bill No. 8092, 244th Sess. (Feb. 8, 2022) (emphasis added). The New York Legislature further emphasized that its intent was "to make it explicitly clear that workers shall not be punished or subjected to discipline for *lawful absence*." *Id.* (emphasis added). The Committee Report makes no intimation of a requirement for an employee to lodge a "complaint" or "proceeding" before having an actionable claim.

child; (2) Laguerre was qualified to be Johnson's assistant in light of her five years of experience on the job, in addition to her consistently positive feedback prior to informing Johnson of her third pregnancy (*see, e.g.*, ECF No. 43-8); and (3) she suffered an adverse employment action in the form of non-reinstatement following her leave.

Laguerre satisfies the fourth element—circumstances giving rise to an inference of retaliation—by presenting evidence that she was informed of her termination *the same day* that she returned from her FMLA-sanctioned leave. *See, e.g.*, *Welch v. Columbia Mem'l Physician Hosp. Org., Inc.*, No. 13-CV-1079, 2015 WL 6855810, at *7 (N.D.N.Y. Nov. 6, 2015) ("Welch returned from FMLA leave days before her supervisors changed her schedule . . . . This very close temporal proximity alone is sufficient to support an inference of retaliation."); *Terry v. Cnty. of Cayuga*, No. 11-CV-1296, 2013 WL 5464395 (N.D.N.Y. Sept. 30, 2013) ("Plaintiff was terminated on the day she returned from FMLA leave. Such close temporal proximity generally gives rise to an inference of retaliation."). "Moreover, [Laguerre] presents more evidence than mere temporal proximity." *Donnelly*, 691 F.3d at 152. As explained above, Johnson had a history of expressing animus toward his pregnant staff through targeted commentary and charged questions. (*See, e.g.*, ECF No. 56-4 at 23-29; ECF No. 56-3 at 224.) Retaliatory intent may further be inferred from the deterioration of Laguerre's performance reviews after she informed Johnson of her third pregnancy. (*Compare* ECF No. 43-8, *with* ECF No. 43-9).

Laguerre has also satisfied her prima facie burden under the NYLL. The first two elements are straightforward: (1) Laguerre took 12 weeks of pregnancy-related leave guaranteed by the FMLA; and (2) she suffered a disadvantaging employment action in the form of termination and non-reinstatement. On the third factor, courts have held that the requisite "causal connection may be established by (1) 'evidence of retaliatory animus directed against a

plaintiff by the defendant'; or (2) a close temporal proximity between the protected activity and the adverse employment action." *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 473 (S.D.N.Y. 2008) (quoting *DeCintio v. Westchester Cnty. Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987)). In *Torres*, the court found causation to be satisfied "because the 28 days between the protected activity and an adverse employment action is 'very close.'" *Id.* at 474 (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001)). Because Laguerre was informed of her termination on the same day that she returned from FMLA-sanctioned leave, the requisite causal connection exists.

In turn, Defendants invoke their company-wide reduction in force as a legitimate, non-retaliatory reason for eliminating the assistant role and terminating Laguerre. (*See* ECF No. 41 at 27.) But based on the same facts from which the Court concludes that there are genuine disputes of fact as to Laguerre's interference claims—namely, Johnson's history of interrogating female employees about their pregnancy plans and the inconsistencies between Zucker's onboarding timeline and Defendants' assertion that the assistant role was unnecessary—the Court concludes that a triable fact issue exists as to whether Defendants' proffered nondiscriminatory rationale for terminating Laguerre was pretextual. Accordingly, Defendants are not entitled to summary judgment as to Laguerre's claims for retaliation under the FMLA and the NYLL.

### 5. NYSHRL and NYCHRL Discrimination Claims

#### a. Legal Standard

The NYSHRL and NYCHRL prohibit discrimination on the basis of sex, gender, and familial status. N.Y. Exec. Law § 296(1)(a); N.Y.C. Admin. Code § 8-107(1)(a). And as relevant here, the NYSHRL and NYCHRL both prohibit discrimination on the basis of pregnancy. *See* N.Y. Exec. Law § 292(26)(a) (providing that discrimination against "any person

who is pregnant" constitutes discrimination on the basis of "familial status"); N.Y.C. Admin. Code § 8-107(1)(a) (prohibiting discrimination on the basis of "caregiver status" and "sexual and reproductive health decision").

"New York amended the NYSHRL to direct courts to construe the NYSHRL, like the NYCHRL, liberally for the accomplishment of the remedial purposes thereof[.]" *Allen v. City of New York*, No. 19-CV-3786, 2024 WL 3965697, at *8 n.3 (S.D.N.Y. Aug. 28, 2024) (cleaned up), *aff'd*, No. 24-2589, 2025 WL 3152723 (2d Cir. Nov. 12, 2025). Thus, the Court analyzes Laguerre's NYSHRL and NYCHRL discrimination claims under the same standard. *See Uttarwar v. Lazard Asset Mgmt. LLC*, No. 22-CV-8139, 2024 WL 1251177, at *7 (S.D.N.Y. Mar. 22, 2024), *aff'd*, No. 24-1085, 2025 WL 704278 (2d Cir. Mar. 5, 2025).

NYSHRL and NYCHRL claims are both analyzed under the *McDonnell Douglas* burden-shifting framework. *See Uttarwar v. Lazard Asset Mgmt. LLC*, No. 24-1085, 2025 WL 704278, at *2 (2d Cir. Mar. 5, 2025) (summary order). "This framework first requires a plaintiff to establish a prima facie case of discrimination, which represents a minimal burden in employment discrimination cases." *Id.* (cleaned up). To establish a prima facie case, a plaintiff must show that (1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Head Injury Ass'n, Inc. v. New York State Div. of Human Rights*, 241 A.D.3d 1335, 1337 (2d Dep't 2025). If the plaintiff establishes a prima facie case, the burden shifts to the employer to set forth a legitimate, nondiscriminatory reason to support its employment decision. *See Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 305 (N.Y. 2004). The burden then shifts back to the plaintiff to demonstrate that the

employer's stated reason was pretextual, and the real reason for the employment decision was discriminatory. *Id.*; *Melman v. Montefiore Med. Ctr.*, 98 A.D.3d 107, 114 (1st Dep't 2012).

"Summary judgment dismissing a claim under the NYCHRL [and post-amendment NYSHRL] should be granted only if no jury could find the defendant liable under any of the evidentiary routes—*McDonnell Douglas*, mixed motive, direct evidence, or some combination thereof." *Bilitch v. New York City Health & Hosps. Corp.*, 194 A.D.3d 999, 1002 (2d Dep't 2021) (cleaned up). However, "the NYCHRL [and post-amendment NYSHRL] [are] not a general civility code." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (quotation marks omitted). Plaintiffs must establish "a discriminatory motive" for any challenged conduct. *Id.* "While claims under the NYCHRL [and NYSHRL] are more liberally construed than claims under Title VII," neither statute "alter[s] the kind, quality, or nature of evidence that is necessary to support or defeat a motion for summary judgment under Rule 56." *Conahan v. MedQuest Ltd.*, No. 20-CV-1325, 2022 WL 16748585, at *6 (S.D.N.Y. Nov. 7, 2022) (cleaned up).

**b. Analysis**

Laguerre establishes a prima facie case of pregnancy-related discrimination. As a pregnant person, Laguerre was a member of a protected class under the NYSHRL and the NYCHRL. As noted above, Laguerre's five years of experience and positive performance reviews demonstrate that she was qualified to be Johnson's assistant, and Laguerre suffered an adverse employment action in the form of termination and non-reinstatement following her FMLA-sanctioned leave.

Regarding the requisite inference of discrimination, Defendants argue that Laguerre's discrimination claims "rest almost entirely on a single remark allegedly made by Mr. Johnson

during Plaintiff's first few months of employment." (ECF No. 41 at 29.) Not so. Laguerre has adduced evidence supporting a history of discrimination against pregnant women. As detailed at length above, there is evidence that Johnson questioned female employees about potential future pregnancies to the point of making them "very, very concerned about telling [him] about . . . being pregnant," made backhanded comments about pregnant women's ability to do the job, and fired employees during their pregnancies. (ECF No. 56-4 at 23-29.) Laguerre situates herself as another casualty in this tradition of discrimination: Johnson questioned her about her familial intentions and downgraded her performance rating after she told him about her third pregnancy. (ECF No. 56-3 at 224-25; ECF No. 43-9.)

"[T]he sequence of events leading to the plaintiff's discharge" and "the more favorable treatment of employees not in the protected group" provide further support of "an inference of discriminatory intent." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009) (quotation marks omitted). While Defendants claim that the company-wide reduction-in-force rendered the assistant post obsolete, Defendants transferred Laguerre's assistant duties to a non-pregnant employee, Zucker, who performed solely those duties for several months after Defendants informed Laguerre of her termination. *See Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135-36 (2d Cir. 2000) (finding inference of age discrimination where plaintiff's duties were partially transferred to a younger employee on termination, and partially transferred to another young employee hired after plaintiff's termination); *Richmond v. Sorensen*, No. 22-CV-10075, 2023 WL 4239083, at *3 ("[E]ven temporary replacements with an individual outside of a plaintiff's protected class suffice to raise a minimal inference of discriminatory intent.") (S.D.N.Y. June 28, 2023). (*See* ECF No. 56-16 at 38; ECF No. 56-8.) Together, this amalgamation of evidence satisfies the "minimal showing" necessary to raise a prima facie case of discrimination. *Bennett*

*v. Health Mgmt. Sys., Inc.*, 92 A.D.3d 29, 35 (1st Dep't 2011); *see also Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203-04 (2d Cir. 1995) ("[T]he showing the plaintiff must make as to the elements of the prima facie case in order to defeat a motion for summary judgment is *de minimis*." (cleaned up)).

From here, the remaining steps of the *McDonnell Douglas* test mirror the Court's earlier analysis under Laguerre's claims for interference under the FMLA and for retaliation under the FMLA and NYLL. Defendants invoke their company-wide reduction as a legitimate, non-discriminatory reason for declining to reinstate Laguerre. But the Court concludes that a genuine issue of material fact exists as to whether that reason is pretextual, in light of the evidence of Johnson's history with pregnant employees and the inconsistencies between Defendants' proffered reason for terminating Laguerre and the timeline of Zucker's onboarding and responsibility absorption. Accordingly, the Court denies summary judgment as to Laguerre's claims for discrimination under the NYSHRL and the NYCHRL.

## IV. Conclusion

For the foregoing reasons, Defendants' motion for sanction is GRANTED as modified, and Defendants' motion for summary judgment is DENIED as to all claims, except for Laguerre's wage notice claims under NYLL § 195. By August 28, 2026, Laguerre shall show cause why her wage notice claims under NYLL § 195 should not be dismissed for lack of subject matter jurisdiction, or shall indicate by letter that she will not pursue those claims. The Court defers decision on summary judgment as to those claims.

The Clerk of Court is directed to close the motions at Docket Numbers 35 and 40.

SO ORDERED.

Dated: August 13, 2026
New York, New York

J. PAUL OETKEN
United States District Judge